# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

TITAN ATLAS MANUFACTURING, )
INC., and STRATA MINE SERVICES, )
LLC, )
     Plaintiffs )
      )
v. )   Case No. 1:11cv00012
      )
FRANK A. SISK and PRECISION ) **REPORT AND**
MINE REPAIR, INC.,** ) **RECOMMENDATION**
     Defendants )

     This case is before this court on the defendants' Motion to Dismiss, Stay Or Transfer, (Docket Item No. 26) ("Motion"). The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held on the Motion on July 26, 2011, and the case is now ripe for disposition. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

## I.    Facts & Procedural History

     Plaintiff Titan Atlas Manufacturing, Inc., ("Titan"), uses technology licensed from Entwicklungs- und Verwertungs-Gesellschaft M.B.H., ("EVG"), to manufacture a prefabricated construction panel known as the "3D Panel." Plaintiff Strata Mine Services, LLC, ("Strata"), uses Titan's 3D Panels to construct mine ventilation overcasts. Frank A. Sisk, ("Sisk"), is the owner of U.S. Letters Patent No. 5,879,231, ("the '231 Patent"). Very basically, the '231 Patent relates to a mine ventilation structure used to block a passageway or to prevent mixture of

-1-

ventilation air at the intersection of two passageways. (Ex. A to Ex. 2 to Docket Item No. 27). Sisk founded defendant Precision Mine Repair, Inc., ("PMR"), in 1995, and it is the exclusive licensee of the '231 Patent. PMR entered into a Distributorship Agreement, ("Agreement"), with Strata Mine Services, Inc., Strata's predecessor,[1] on August 26, 2007. Two amendments to the Agreement were, thereafter, executed. The Agreement and all amendments were executed in Illinois and, possibly, Ohio. Under the terms of the Agreement, PMR retained certain "Company Responsibilities," including (1) performing all pull testing to ensure that the products comply with all governmental requirements; and (2) performing intermittent inspections of Strata's construction and installation of the products to verify that all construction and installation conforms to all applicable specifications and governmental requirements. The Agreement gave Strata the nonexclusive right to "purchase, distribute, sell and construct" PMR's products and structures which were covered by the '231 Patent. The Agreement also granted Strata certain exclusive rights, including "exclusive Distributorship Rights" to mine sites where Strata had contracted or installed mine ventilation structures. Sisk personally negotiated the Agreement with Strata.

On December 31, 2010, Sisk learned that Strata had several non-PMR 3D panels in its warehouses and that several non-PMR 3D panels were found at the Enlow Fork Mine in Pennsylvania, a customer of Strata's where PMR products previously had been installed. On January 3, 2011,[2] Sisk sent a letter on behalf of PMR advising Strata that its purchase of such substitute goods breached the

---

[1] Strata and all related entities will hereafter be referred to collectively as "Strata."

[2] Although this letter is dated January 3, 2010, the parties concede that this is a typographical error and that the accurate date of the letter is January 3, 2011.

Agreement and that, pursuant to the Agreement, Strata had 30 days to cure its breach. (Ex. B to Ex. 1 to Docket Item No. 27) ("January 3, 2011, Letter"). Sisk testified by affidavit that at the time he sent this letter, neither he nor anyone at PMR knew the identity of the competing manufacturer who had provided the non-PMR 3D panels to Strata. (Ex. 1 to Docket Item No. 27, ("Second Sisk Declaration"), at 2.) On January 17, 2011, Jeffrey Hamrick, Strata's Vice President, e-mailed PMR a letter, directed to Sisk, responding to the January 3, 2011, Letter, in which Strata stated that the panels, manufactured by Titan were ordered solely for limited use, admitting that at least 16 panels were shipped to the McElroy Mine, located in West Virginia and stating its willingness to resolve its differences with PMR. (Ex. C to Ex. 1 to Docket Item No. 27) ("January 17, 2011, Letter.") Thereafter, on January 25, 2011, Sisk initiated a telephone call to Hamrick, during which Sisk stated "You're done … I'm pulling the plug." (Att. 3 to Docket Item No. 32, ("Hamrick Declaration"), at 5). Sisk further informed Hamrick that Strata could not build overcasts, undercasts or stoppings without his patent. (Hamrick Declaration at 5). During this telephone conversation, Sisk also referred to Strata's use of Titan's 3D Panels as "illegal." (Hamrick Declaration at 5). Sisk states that he merely reminded Hamrick that in order for Strata to practice the patented mine ventilation system, Strata had to use materials purchased from PMR, including the 3D Panels. (Docket Item No. 54, ("Fourth Sisk Declaration"), at 8). Sisk states that he noted his belief that a mine ventilation system constructed with 3D Panels supplied by other manufacturers would likely be "illegal." (Fourth Sisk Declaration at 8). Sisk states that he used the term "illegal" to mean that they would not have MSHA approval and had not been appropriately tested. (Fourth Sisk Declaration at 8). Sisk states that he did not accuse Strata of infringing the '231 Patent, but told Hamrick that mine ventilation structures using 3D Panels of

-3-

the type sold by PMR were protected by the '231 Patent. (Fourth Sisk Declaration at 8-9). He states that he does not recall using the words "pulling the plug," but if he did, he believes he was referring to the termination of the Agreement. (Fourth Sisk Declaration at 9).

On February 1, 2011, Titan entered into a Sole Source Purchase Agreement with Strata, in which Titan agreed to indemnify Strata from all "losses, liabilities, suits, costs, expenses, demands, actions, penalties … or other claims … arising or resulting from any Strata Claims and Losses experienced by the Strata Indemnified Parties that are made by [PMR] or … Sisk … to the effect that any of the Strata Indemnified Parties, by using Products for constructing overcasts, undercasts and/or stoppings in underground mines, is infringing any claim contained in the 231 Patent. …" (Att. 1 to Docket Item No. 73, ("Indemnification Agreement"), at 9).

Thereafter, Jeff Kearns, PMR's Project Administrator, sent a letter to the attention of Hamrick, dated February 14, 2011, notifying Strata that, as a result of Strata's breach, it was terminating its Agreement with Strata, except as to certain ongoing projects. (Ex. D. to Ex. 1 to Docket Item No. 27) ("February 14, 2011, Letter.") On February 16, 2011, Hamrick e-mailed a letter, dated January 16, 2011, to some of Strata's customers, notifying them that Titan would be providing Strata with substitute goods made on the identical machine as the PMR mine ventilation structure products. (Ex. E to Ex. 1 to Docket Item No. 27) ("January 16, 2011, Letter.") PMR alleges that it became aware of this e-mail and accompanying letter no earlier than February 17, 2011, the date that Titan filed its Original Complaint in the instant action. The recipients of the January 16, 2011, Letter included

-4-

companies having offices in or operating mines in Illinois, Alabama, Kentucky, Ohio, Pennsylvania, Utah, Virginia and West Virginia. (Second Sisk Declaration at 2.)

At the time the parties negotiated and entered into the Agreement, Strata had its "principal operating office" in Swords Creek, Virginia. From this facility, Strata distributed products, including PMR's products, to mines and/or mine operators in Virginia. Invoices dated November 2, 5, 9, 14 and 30, 2007; December 3 and 7, 2007; January 10, 22 and 25, 2008; March 20, 2008; May 16 and 30, 2008; and June 2, 2008, were sent from Strata's Virginia facility. Strata moved its principal operating office from Virginia to Georgia sometime during 2008, but retained the Virginia facility as a regional support center.

In addition to Strata, PMR used another Virginia distributor, GMS, to which PMR shipped products in Virginia. From 2007 through 2011, the time period covering the execution of the Agreement through the filing of both the Original and Amended Complaints, PMR's total revenue arguably attributable to Virginia was approximately $2.2 million. This included shipments of Gunite and other materials to Strata's Virginia facility, shipments of products to Virginia mines on behalf of Strata, shipments of products to Virginia mines on behalf of GMS and invoicing for pull tests in Virginia mines and materials related thereto.

In an article in the October/November 2007 issue of *Coal People Magazine*, Harry Riddle, former General Manager of PMR, stated that "[t]he vast majority of [PMR's] work is in Ohio, Illinois, Indiana, Kentucky, West Virginia, Virginia,

-5-

Alabama and Pennsylvania." (Ex. D. to Ex. 2 to Docket Item No. 32, ("Coal People Article"), at 5).

Titan filed its Original Complaint against defendant Sisk on February 17, 2011, seeking a declaratory judgment that (1) Titan is a co-owner or licensee of the '231 Patent; (2) Titan has not infringed any valid claims of the '231 Patent; and (3) each and every claim of the '231 Patent is invalid and unenforceable. Titan further sought an injunction preventing Sisk from enforcing or threatening to enforce the '231 Patent against Titan or its mining customers. On March 14, 2011, Sisk received a copy of the Original Complaint from Titan. Thereafter, on April 4, 2011,[3] Sisk and PMR filed an action in the Southern District of Illinois, ("Illinois Action"), Civil Action No. 3:11cv00264, which included the following claims: (1) breach of contract against Strata; (2) tortious interference with a contractual relationship or business expectancy by Titan; (3) patent infringement by Strata; (4) inducement of patent infringement by Titan; and (5) inducement of patent infringement by Strata and Titan. All of these claims arose out of Strata's alleged breach of the Agreement with PMR.

On April 5, 2011, Titan filed its First Amended Complaint, (Docket Item No. 11) ("Amended Complaint"), in which it added Strata as a plaintiff and PMR as a defendant. The Amended Complaint seeks the following relief: a declaratory judgment that (1) Titan is a co-owner or licensee of the '231 Patent; (2) that Titan and Strata have not infringed any valid claims of the '231 Patent; and (3) that each

---

[3] The record shows that the Complaint was tendered to the court and the Illinois Action was opened on April 4, 2011, but that the Complaint was not "formally" filed until April 5, 2011. This court has held that tendering a document for filing along with the requisite filing fee constitutes filing. *See Cornett v. Weisenburger*, 454 F. Supp. 2d 544 (W.D. Va. 2006).

-6-

and every claim of the '231 Patent is invalid and unenforceable. The plaintiffs further seek an injunction preventing Sisk and PMR from enforcing or threatening to enforce the '231 Patent against either Titan or Strata. On April 12, 2011, Sisk and PMR filed its Amended Complaint in the Illinois Action, advising the court of the existence of the Amended Complaint in the instant action. On May 20, 2011, Sisk and PMR filed the Motion currently before the court, arguing that the Amended Complaint should be dismissed, that the action should be stayed pending the resolution of the Illinois Action or, in the alternative, that this case should be transferred and consolidated with the Illinois Action. For all of the reasons that follow, I recommend the court grant the Motion in part and deny the Motion in part.

## I.      Analysis

### A. Subject Matter Jurisdiction

The defendants contend that this court lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). A district court may exercise subject matter jurisdiction over a declaratory judgment action only if the action presents a "case of actual controversy." *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 936 (Fed. Cir. 1993) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937)). The case must be "of sufficient immediacy and reality" to warrant declaratory relief. *Genentech*, 998 F.2d at 936 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Prior to 2007, the Federal Circuit held that the court's determination as to whether there is an actual controversy in patent actions involves a two-part inquiry: (1) whether the declaratory plaintiff has

-7-

acted in such a way that the patentee asserts infringes the patent, or is preparing to act in such a way; and (2) whether the patentee has created in the declaratory plaintiff a reasonable apprehension of suit for infringement. *See Genentech*, 998 F.2d at 936 (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735-36 (Fed. Cir. 1988)). The Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), broadened the standard for declaratory judgment jurisdiction in patent cases from "a reasonable apprehension of suit" test to an "all circumstances" test. Specifically, the Court reaffirmed the test for declaratory judgment jurisdiction as "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127, (quoting *Md. Cas Co.*, 312 U.S. at 273). Thus, the finding of declaratory judgment jurisdiction rests on the sum of all the facts and circumstances.

Despite the broadening of the standard for declaratory judgment jurisdiction by *MedImmune*, it is clear that meeting the reasonable apprehension test remains one way to establish declaratory judgment jurisdiction. *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) ("following *MedImmune*, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test…"). It is well-settled that the test for declaratory judgment jurisdiction in patent cases is an objective one. *See Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) (it is the objective words and actions of the patentee that are controlling in determining whether declaratory judgment jurisdiction exists in a patent case; thus, conduct that can be reasonably inferred as

-8-

demonstrating intent to enforce a patent can create declaratory judgment jurisdiction.). The court in *Hewlett-Packard* held that "[i]n patent cases, declaratory judgment jurisdiction exists 'where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license.'" 587 F.3d at 1361 (quoting *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007)). However, "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute. More is required to establish declaratory judgment jurisdiction." *Hewlett-Packard*, 587 F.3d at 1362. However, jurisdiction for a declaratory judgment action cannot be defeated simply by correspondence that avoids the magic words "litigation" or "infringement." *Hewlett-Packard*, 587 F.3d at 1362.

Further, subject matter jurisdiction must be established at the time the Original Complaint was filed in this case. In *Arrowhead*, 846 F.2d at 734 n.2, the court noted that "[t]he presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed." Similarly, in *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996) (quoting *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 635 (Fed. Cir. 1991)), the court held that "later events may not create jurisdiction where none existed at the time of filing." In *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1384 (Fed. Cir. 2010), the court held that "unless there was jurisdiction at the filing of the original complaint, jurisdiction could not be carried back to the date of the original pleading." The court continued by stating

-9-

that "Federal Rule of Civil Procedure 15(c) does not treat events that post-date the original pleading as if they had occurred at an earlier time." *Innovative Therapies, Inc.*, 599 F.3d at 1384. All of this being the case, I find that the court must limit its inquiry to whether it was vested with subject matter jurisdiction as of the time of the filing of the Original Complaint on February 17, 2011.

The court finds the following relevant to its determination of subject matter jurisdiction: (1) the January 3, 2011, Letter from PMR to Strata; (2) the telephone conversation between Sisk and Hamrick that occurred on or about January 25, 2011; and (3) the February 14, 2011, Letter from PMR to Strata. As stated above, the January 3, 2011, Letter, revoked Strata's license to use the '231 Patent and stated PMR's intent to terminate the Agreement as of February 2, 2011, unless Strata cured its alleged breach within 30 days. Specifically, in this letter, Sisk stated as follows: "With the issuance of this letter PMR[] revokes any prior authorization for use of our U.S. Patent No. 5,879,231 [d]ated March 9, 1999[,] included directly or indirectly in our … Agreement dated August 26, 2007." (January 3, 2011, Letter at 1). The letter further states "This termination is due to a direct bre[a]ch of terms contained in the agreement related to Exhibit A (2) whereas [Strata] has provided and allowed a component, not supplied by PMR[], to be installed as part of our MSHA approved overcast design." (January 3, 2011, Letter at 1.) Strata responded by letter attached to an e-mail dated January 17, 2011. In this letter, Hamrick stated, in relevant part, as follows: "Your letter is devoid of any alleged specific instance where Strata is alleged to have installed overcasts (or undercast[s]) in any mine using nonapproved panels that were manufactured by any party other than [PMR]. No such instance has occurred." (Ex. C. to Ex. 1 to Docket Item No. 27) ("January 17, 2011, Letter").

-10-

While the parties concede that a telephone conversation, initiated by Sisk, occurred between Sisk and Hamrick on January 25, 2011, they disagree as to the intent of the conversation. The plaintiffs contend that Sisk's intent was to inform Strata that its use in mines of 3D Panels purchased from Titan would constitute an infringement of the '231 Patent, while Sisk contends that any statements made during this conversation were not intended to accuse Strata of infringement, but to inform Strata that such use of non-PMR 3D Panels would be illegal, in that they would not be MSHA-approved and would not have been appropriately tested. Although Sisk does not recall making the statement about "pulling the plug," he does not deny making it. Instead, he contends that if he did make such a comment, it was in relation to the termination of the Agreement. As stated above, however, the court's inquiry must be undertaken from an objective standpoint, so that what Sisk claims he meant is not determinative of the issue. Instead, what matters is whether Sisk's statements made in the letters and during the conversation could reasonably be inferred as demonstrating intent to enforce a patent. Lastly, Kearns, PMR's Project Manager, sent a letter dated February 14, 2001, to Strata at Hamrick's attention, stating that "your … Agreement with PMR has been terminated effective as of February 3, 2011." (February 14, 2011, Letter).

I find that, under the *MedImmune* totality of the circumstances test, an objectively reasonable person in Strata's position could interpret Sisk's/PMR's actions as implicitly asserting its rights under the '231 Patent. In other words, I find that such a person could reasonably interpret such conduct as demonstrating an intent by Sisk/PMR to enforce the '231 Patent. As the court found in *Hewlett-Packard*, I now find that when viewed objectively and in totality, the facts of this

case show that Sisk/PMR took the affirmative step of contacting Strata directly, by letter and by telephone, making an implied assertion of its rights under the '231 Patent.  Furthermore, Strata explicitly disagreed with such implied assertion in its January 17, 2011, Letter.  *See* 587 F.3d at 1364.

It is for all of these reasons that I find that this court has subject matter jurisdiction as to Strata's claims against the defendants.  As for Titan, Strata and Titan entered into an indemnification agreement dated February 1, 2011, which effectively places Titan in the shoes of Strata.  That being the case, I find that this court also has subject matter jurisdiction over the claims brought by Titan against the defendants, and I recommend that the court deny the Motion on this ground.

B.      *Personal Jurisdiction*

The defendants argue that this court lacks personal jurisdiction over both Sisk and PMR pursuant to Federal Rule of Civil Procedure 12(b)(2).  For the following reasons, I disagree. The plaintiffs bear the burden of proving facts necessary to establish personal jurisdiction over the defendants.  *See Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1330-31 (Fed. Cir. 2008).  When a district court decides a personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction and, in deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff.  *See Carefirst of Md. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Here, the court denied the defendants' motion to conduct limited jurisdictional discovery and to hold an evidentiary hearing.  That being the

-12-

case, I find that the plaintiff must make only a prima facie showing of personal jurisdiction.

Federal Circuit law governs the substantive issue of whether a court may exercise personal jurisdiction over a particular defendant in patent and patent-related cases. *See Reynolds & Reynolds Holdings, Inc. v. Data Supplies, Inc.*, 301 F. Supp. 2d 545, 549 (E.D. Va. 2004) (citing *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1348 (Fed. Cir. 2002)); *Cognitronics Imaging Sys., Inc. v. Recognition Research, Inc.*, 83 F. Supp. 2d 689, 694 n.5 (E.D. Va. 2000). To determine whether personal jurisdiction exists over an out-of-state defendant requires a two-part inquiry: (1) whether a forum state's long-arm statute permits service of process; and (2) whether assertion of personal jurisdiction violates due process. *See Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009). The Virginia long-arm statute, found at VA. CODE ANN. § 8.01-328.1, reads in relevant part as follows: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting any business in this Commonwealth. . . ." "Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Sportrust Assocs. Int'l, Inc. v. Sports Corp.*, 304 F. Supp. 2d 789, 792 (E.D. Va. 2004) (quoting *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002)). "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

-13-

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Two types of personal jurisdiction exist: (1) general personal jurisdiction; and (2) specific personal jurisdiction. A court exercises general personal jurisdiction when it exercises personal jurisdiction over a defendant in a suit not arising out of the defendant's contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n.9 (1984). For general jurisdiction over a corporation to comport with due process, there must be "continuous corporate operation within a state [that is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993) (quoting *Int'l Shoe*, 326 U.S. at 318); *see also Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1200 (Fed. Cir. 2003). Sufficient minimum contacts for the constitutional exercise of general personal jurisdiction exist where a nonresident corporation has substantial contacts with the forum state that are "continuous and systematic." *Reynolds & Reynolds Holdings, Inc.*, 301 F. Supp. 2d at 550 (quoting *Helicopteros*, 466 U.S. at 416). Neither the Supreme Court nor the Federal Circuit has established any specific test for analyzing whether a defendant's activities within a state are "continuous and systematic." *Reynolds & Reynolds Holdings, Inc.*, 301 F. Supp. 2d at 550 (quoting *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000)). "Instead, the court must look at the facts of each case to make such a determination." *Reynolds & Reynolds Holdings, Inc.*, 301 F. Supp. 2d at 550 (quoting *LSI Indus., Inc.*, 232 F.3d at 1375). For general jurisdiction over a corporation to comport with due process, the corporation's corporate operation

-14-

within a state must not merely be continuous and systematic, but also substantial. *See Sportrust Assocs. Int'l, Inc.*, 304 F. Supp. 2d at 793 n.4.

Specific personal jurisdiction, on the other hand, must be based on activities that "'arise [] out of' or 'relate[] to' the cause of action and may exist even if the defendant's contacts are 'isolated and sporadic.'" *Silent Drive*, 326 F.3d at 1200 (quoting *Burger King Corp. v. Rudzewicz*, 417 U.S. 462, 472-73 (1985)). The following three-part test is used to determine whether a defendant is subject to specific personal jurisdiction: (1) the defendant must have purposefully directed its activities at residents of the forum; (2) the claim must arise out of or relate to those activities; and (3) the assertion of personal jurisdiction must be reasonable and fair. *See Autogenomics*, 566 F.3d at 1018. Finally, and importantly, it is well-settled that, in evaluating specific personal jurisdiction in a declaratory judgment action against a patentee, as here, a court should look only at the defendant's efforts to enforce the patent-in-suit and may not consider a defendant's efforts to market or sell commercial embodiments of the patent-in-suit. *See Autogenomics*, 566 F.3d at 1020 (citing *Avocent*, 552 F.3d at 1336). Furthermore, "[t]he proper focus in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action." 16 JAMES WM. MOORE ET AL., MOORE'S FED. PRACTICE ¶ 108.42[2][a] (3d ed. 2011). In *Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005), the First Circuit held that in analyzing specific jurisdiction, contacts must generally be limited to those before and surrounding the accrual of the cause of action. The court based this finding on its reasoning that "three key themes" of specific jurisdiction analysis, namely, (1) fair notice to the defendant; (2) that the defendant must have purposefully availed itself of the forum state; and (3) that the forum-based activity be truly related to the cause of action, required

-15-

such a limitation on the contacts that may be considered in determining the existence of specific personal jurisdiction. *See Harlow,* 432 F.3d at 61; *see also Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 66 (1st Cir. 2002) ("for specific jurisdiction, contacts should be judged when the cause of action arose. …").

### i. *General Jurisdiction Over PMR*

Based on the following reasons, I find that this court has general jurisdiction over PMR. I find that PMR has the requisite continuous and systematic, as well as substantial, contacts with Virginia such that requiring PMR to defend this case in Virginia would not violate traditional notions of fair play and substantial justice. Particularly, I find most important that PMR entered into the 2007 Agreement with Strata, a corporation that it knew, or by all indications, should have known, had a facility in Virginia and distributed products, including PMR's products, to mines and/or mine operators in Virginia. In the Coal People Article, PMR's former General Manager, stated that "[t]he vast majority of [PMR's] work is in Ohio, Illinois, Indiana, Kentucky, West Virginia, *Virginia*, Alabama and Pennsylvania." (Coal People Article at 5) (emphasis added). The plaintiffs have provided invoices dated November 2, 5, 9, 14 and 30, 2007; December 3 and 7, 2007; January 10, 22 and 25, 2008; March 20, 2008; May 16 and 30, 2008; and June 2, 2008, showing that Strata's invoices were sent from Virginia. Additionally, the Agreement contains certain "Company Responsibilities," which included (1) performing all pull testing; and (2) performing intermittent inspections of Strata's construction and installation of the products. Given such responsibilities, I find that it would not violate traditional notions of fair play and substantial justice to require PMR to

-16-

defend this case in Virginia, where such responsibilities are to be executed. I further find that, regardless of the number of pull tests and/or inspections actually performed by PMR personnel in Virginia, the mere fact that PMR imposed these obligations upon itself prevents the defendants from now arguing otherwise. Additionally, I find that PMR knew, at the time the Agreement was negotiated and executed, that Strata had a warehouse in Virginia and that Strata supplied products to mines and/or mine operators in Virginia. Furthermore, PMR does not dispute that it has another distributor, GMS, that is located in Virginia and that PMR has shipped products to GMS in Virginia. For all of these reasons, I find that PMR has the requisite minimum contacts with Virginia as contemplated in *Int'l Shoe*.

Finally, I find that the record shows that PMR performed a substantial amount of business in Virginia from at least 2007 through 2011, the period of time covering the execution of the Agreement through the filing of the Original and Amended Complaints. While the defendants argue that the amount of revenue attributable to a forum must be based on a percentage of sales as a whole in order to determine whether a company performs a substantial amount of business in a forum, I am not persuaded by this argument. Instead, I find that the amount itself need only be deemed substantial. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994). Here, the parties have produced evidence that PMR's total revenue arguably attributable to Virginia was approximately $2.2 million. This included shipments of Gunite and other materials to Strata's Virginia location, shipments of products to Virginia mines on behalf of Strata, shipments of products to Virginia mines on behalf of GMS and invoicing for the pull tests in Virginia mines and materials related thereto. I find all of these activities relevant to the court's determination of whether PMR conducted a substantial amount of

-17-

business in Virginia. All of this being the case, I find that PMR's $2.2 million of revenue derived from business related to Virginia from 2007 to 2011 constitutes the requisite "substantial" business under *Int'l Shoe*. Therefore, I find that Strata has both sufficient minimum contacts, as well as substantial contacts, with Virginia to confer general jurisdiction over it in this forum, and I recommend that the court deny the Motion on this ground.

ii.     *Personal Jurisdiction over Sisk*

As to whether this court has personal jurisdiction over defendant Sisk, I note that the plaintiffs contend that the court has both general jurisdiction, as well as specific jurisdiction, over Sisk. As the general jurisdiction argument with regard to Sisk is the more difficult, and because I find that the court has specific jurisdiction over Sisk, I will not discuss the validity of the plaintiffs' general jurisdiction argument.

In *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995), the Federal Circuit summarized the Supreme Court's jurisprudence by setting forth a three-factor test to determine whether asserting jurisdiction over an out-of-state defendant comports with due process. The three factors are: (1) whether the defendant "purposefully directed" its activities at residents of the forum; (2) whether the claim "arises out of or relates to" the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is "reasonable and fair." *Akro*, 45 F.3d at 1545. The first two factors correspond with the "minimum contacts" prong of the *International Shoe* analysis, and the third factor corresponds

-18-

with the "fair play and substantial justice" prong of the analysis. *See Akro*, 45 F.3d at 1545.

As stated earlier, the court's focus when determining specific personal jurisdiction issues in patent-related cases is on the enforcement activities undertaken by the defendants. Additionally, this court must consider only Sisk's enforcement activities undertaken leading up to and surrounding the accrual of the cause of action. *See Harlow*, 432 F.3d at 61; *Cambridge Literary Props., Ltd.*, 295 F.3d at 65. The parties have presented the court with evidence that Sisk sent the January 3, 2011, Letter on behalf of PMR revoking Strata's license to use the '231 Patent and stating the intention to terminate the Agreement as of February 2, 2011, unless Strata cured its alleged breach of the Agreement. This letter was sent by Sisk to Hamrick, Strata's General Manager. Next, on or about January 25, 2011, in the telephone conversation between Sisk and Hamrick, Sisk reminded Hamrick that in order for Strata to practice the patented mine ventilation system, Strata had to use materials purchased from PMR including the 3D Panels. Sisk further referred to construction of a mine ventilation system with 3D Panels supplied by other manufacturers as likely being "illegal." The parties are in disagreement about Sisk's intent during this conversation. However, as stated above, the statements made in these letters and conversation must be viewed objectively.

The plaintiffs argue that Sisk's statements constituted an attempt to enforce the patent. It is true that mere letters or other communications asserting patent rights are insufficient, by themselves, to establish jurisdiction. *See Autogenomics*, 566 F.3d at 1020; *Silent Drive*, 326 F.3d at 1202. More is required. In this regard, I find *Inamed Corp. v. Kuzmak*, 249 F.3d 1356 (Fed. Cir. 2001), particularly

-19-

instructive to the case at bar. In *Inamed*, the Federal Circuit held that infringement letters sent to the forum, in combination with negotiations that resulted in four license agreements with the plaintiff based on the defendant's four patents, was sufficient to show that the patentee purposefully directed his activities at residents of the forum state. *See Inamed*, 249 F.3d at 1361-62. Here, Sisk negotiated the Agreement with Strata, a company which he knew or should have known had a presence in Virginia to provide products and services pursuant to the '231 Patent. It does not matter that the negotiations occurred largely in Illinois and, possibly, in Ohio. What matters is that Sisk knew he was negotiating with a company with specific ties to Virginia. Thus, I find the combination of Sisk's letters and telephone conversation with Hamrick and his negotiation efforts which resulted in a license agreement with Strata, a company he knew or should have known had a presence in Virginia, is sufficient to show the requirement that Sisk purposefully directed his activities at residents of Virginia.

Next, I find that the plaintiffs' claim arises out of or relates to the defendants' activities directed at the forum. More specifically, it is clear that the plaintiffs' declaratory judgment action arises directly from the defendants' letters and the telephone conversation described above. As the *Inamed* court noted, "[t]he central purpose of a declaratory action is often to 'clear the air of infringement charges.'" 249 F.3d at 1362 (quoting *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998)). Thus, without such letters and conversation, no declaratory judgment action would have been filed by the plaintiffs.

-20-

Once the plaintiff satisfies the first two factors of the *Akro* test, the burden shifts to the defendant to persuade the court that the exercise of personal jurisdiction over him is not "reasonable and fair." *Inamed*, 249 F.3d at 1363 (citing *Akro*, 45 F.3d at 1545-46 (citing *Burger King*, 471 U.S. at 476-77). In evaluating the reasonableness of exercising jurisdiction, several factors must be considered: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987). In *Akro*, the court stated as follows: "Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." 45 F.3d at 1546 (quoting *Burger King*, 471 U.S. at 476-77) (emphasis added). The court proceeded to state that cases where a defendant may defeat otherwise constitutional personal jurisdiction should be "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum" *Akro*, 45 F.3d at 1549 (quoting *Beverly Hills Fan Co.*, 21 F.3d at 1568). The *Akro* court found that Ohio had a "manifest interest" in providing plaintiff, a resident of the state, a convenient forum for redressing the restraint of its production of goods by means of a noninfringed, invalid and/or unenforceable patent. *See* 45 F.3d at 1549.

While the defendants have argued that defending this case in this district would be burdensome, I find that Sisk has failed to present a compelling case that the exercise of jurisdiction by this court over him would be unreasonable. It is for all of these reasons that I find that this court has specific personal jurisdiction over Sisk, and I recommend that the court deny the Motion on this ground.

### C. Failure to State a Claim

The defendants also argue that the plaintiffs have failed to state a claim for declaratory judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) with regard to allegations of direct, contributory or inducement of infringement against Titan. Thus, they claim that the plaintiffs' allegations do not support a basis for a declaration of noninfringement by Titan. Additionally, the defendants argue that plaintiffs' invalidity claims are deficient. Particularly, the defendants point to the plaintiffs' claim of inequitable conduct, claiming that Federal Rule of Civil Procedure 9(b) requires identification of the specific "who, what, when, where and how" of the material misrepresentation or omission committed before the Patent and Trademark Office, ("PTO"). *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009).

The Supreme Court recently revisited the proper standard of review for a motion to dismiss and stated that the long-used "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), has "earned its retirement" and "is best forgotten" because it is an "incomplete, negative gloss on an accepted pleading standard." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007). In *Twombly*, the Supreme Court stated that "a plaintiff's obligation to provide the

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).  Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible.  *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. …  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. …
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

(Internal citations omitted).

For the purpose of ruling on the motion to dismiss for failure to state a claim, this court, therefore, will assume that all well-pleaded factual allegations

contained in the plaintiffs' Amended Complaint are true. Plaintiffs primarily seek a declaration of noninfringement. There are three ways that a patent can be infringed. First, a patent may be directly infringed. In this instance, anyone, who without authority, makes, uses, offers to sell or sells any patented invention within the United States during the patent's term, or imports into the United States any patented invention during the term of the patent, therefore, infringes the patent. *See* 35 U.S.C.A. § 271(a) (West 2001). The defendants argue that "there is no possible basis alleged for direct infringement" against Titan because Titan did not allege that it installs the 3D Panels in mines and that the only possible basis for a claim against Titan is indirect infringement. I agree. There simply are no allegations in the Amended Complaint that Titan, without authority, makes, uses, offers to sell or sells any patented invention within the United States during the patent's term. The Amended Complaint states that Titan sells 3D Panels to Strata, who then uses the 3D Panels to construct mine ventilation overcasts, undercasts and stoppings. This is not sufficient, however, to state a potential claim of direct infringement against Titan because it is not the 3D Panels that are the patented invention at issue. The '231 Patent applies to the mine ventilation structure, a component of which is the 3D Panel. Therefore, I recommend that, insofar as the Amended Complaint seeks a declaratory judgment that Titan did not directly infringe the '231 Patent, such claim be dismissed.

Next, the defendants argue that the Amended Complaint fails to sufficiently allege a claim for a declaration that Titan has not committed contributory infringement. Again, I agree. To establish contributory infringement, a patent owner must show the following elements: (1) that there is direct infringement; (2) that the accused infringer had knowledge of the patent; (3) that the component has

-24-

no substantial noninfringing use; and (4) that the component is a material part of the invention. *See* 35 U.S.C.A. § 271(c) (West 2001); *see also Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). I find that the Amended Complaint fails to adequately allege that the 3D Panels Titan sold to Strata had the requisite substantial noninfringing use. Thus, I recommend that, insofar as the Amended Complaint seeks a declaratory judgment that Titan did not contributorily infringe the '231 Patent, such claim be dismissed.

Finally, the defendants argue that the Amended Complaint fails to sufficiently allege a claim for a declaration that Titan has not induced infringement. Again, I agree. To establish inducement, a patent owner must show that the accused induced the infringing acts and knew or should have known that its actions would induce actual infringement. It is not enough to simply intend to induce the infringing acts. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003). Here, the plaintiffs allege only that Titan sold 3D Panels to Strata, who then used them to construct mine ventilation overcasts. There is no allegation that Titan did not induce any alleged infringing acts by Strata or that Titan did not know or should not have known that its actions would induce Strata to actually infringe the '231 Patent. Therefore, I recommend that, insofar as the Amended Complaint seeks a declaratory judgment that Titan did not induce infringement of the '231 Patent, such claim be dismissed.

The defendants further contend that the Amended Complaint fails to state a claim of invalidity, especially as to any claims of inequitable conduct by the defendants. The elements of inequitable conduct are: (1) an individual associated with the filing and prosecution of a patent application made an affirmative

misrepresentation of a material fact, failed to disclose the material information or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO. *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). The defendants argue that the plaintiffs' claims of invalidity are little more than "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements" held inadequate under *Iqbal*. They emphasize that the plaintiffs did not name any specific prior art or any information from which the defendants could be on notice of the basis of the claim of inventorship or license. Specifically, the defendants argue that, under *Exergen*, "in pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific *who, what, when, where, and* how of the material misrepresentation or omission committed before the PTO." 575 F.3d at 1327 (emphasis added). I find that the plaintiffs did sufficiently put the defendants on notice of whom it alleges has a claim of inventorship or license by stating: "employees of either one of EVG or Titan Atlas's predecessor-in-interest materially contributed to at least one element of the claims recited in the '231 patent. As such, Titan Atlas is or would have been either a co-owner or a licensee of the '231 Patent and is entitled to use and sublicense to Strata the technology claimed therein."

However, I find that the plaintiffs have failed to sufficiently plead the specific what, when, where and how of the material misrepresentation or omission committed before the PTO. Additionally, I find, as did the court in *Exergen*, that the plaintiffs have failed to include sufficient allegations of underlying facts from which this court may reasonably infer that a specific individual "(1) knew of the withheld material information or of the falsity of the material misrepresentation,

-26-

and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." 575 F.3d at 1328-29. "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." *Exergen*, 575 F.3d at 1329 n.5.

While the plaintiffs' Amended Complaint fails to specifically identify Sisk as the individual associated with the filing or prosecution of the application issuing as the '231 Patent, it is clear from the Amended Complaint that the "who" is Sisk. Specifically, attached to the Amended Complaint is a copy of the '231 patent with Sisk's name at the top and which lists Sisk as the inventor.

Next, I find that the Amended Complaint fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found. *See Exergen*, 575 F.3d at 1329 (citing *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1570 (Fed.Cir. 1997) ("Information is material if a reasonable examiner would have considered it important to the patentability of a *claim*") (emphasis added)). The plaintiffs here refer only to the "alleged invention" and stated that the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art to which the subject matter pertains." Additionally, the plaintiffs state only that the alleged invention was patented or described "in a printed publication in this or a foreign country" before Sisk's alleged invention thereof. Likewise, the plaintiffs state only that the alleged invention "was in public use or on sale in this country" more than one year prior to Sisk's date of application for the '231 patent, and that "the

-27-

invention was described in an application for patent … by another filed in the United States" before the invention by Sisk for the patent. Therefore, I find that the plaintiffs have failed to identify the prior art and where it could be found with sufficient particularity as required by *Exergen*. Thus, I find that the plaintiffs have failed to adequately identify the "what" and the "where" of the alleged material omissions.

Third, the plaintiffs simply state that "[d]uring the prosecution of the '231 Patent before the U.S. Patent Office, the Applicant intentionally failed to disclose material prior art to the Patent Office and misrepresented that he was the first and sole inventor of the invention sought to be patented." Therefore, while the plaintiffs allege that the withheld information was material, they do not identify the particular claim limitations or combination of limitations that it alleges were absent from the record before the PTO. As the *Exergen* court stated, "[s]uch allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims" 575 F.3d at 1329-30.

Finally, I find that the facts alleged by the plaintiffs "do not give rise to a reasonable inference of scienter, including both (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Exergen*, 575 F.3d at 1330. As noted above, the plaintiffs only make reference to the alleged invention being described in a printed publication, it being in public use or on sale and being described in a different patent application prior to Sisk's alleged invention thereof. It seems as though the plaintiffs would like for the court to infer that, as such, Sisk should have

-28-

known of the prior art. However, this undoubtedly is insufficient for pleading knowledge of the withheld information or of the falsity of the material misrepresentation. Additionally, the plaintiffs simply state that "[d]uring the prosecution of the '231 Patent before the U.S. Patent Office, the Applicant intentionally failed to disclose material prior art to the Patent Office and misrepresented that he was the first and sole inventor of the invention sought to be patented." I find that this constitutes a "threadbare recital" of the element of specific intent.

It is for all of these reasons, that I find that the plaintiffs' Amended Complaint fails to sufficiently plead inequitable conduct under the *Exergen* pleading standard, and I recommend that the court grant the defendants' Motion on this ground and dismiss the plaintiffs' inequitable conduct claim.

### D. *Motion to Stay or Transfer*

Lastly, the defendants argue that this action should be transferred to the Southern District of Illinois and consolidated with the Illinois Action. A motion to transfer is evaluated pursuant to the change of venue statute, found at 28 U.S.C. § 1404. According to § 1404, a civil action may be transferred to any other district where it might have been brought for the convenience of the parties and witnesses and in the interest of justice. *See* 28 U.S.C.A. § 1404(a) (West 2006). The question of transferability depends on the circumstances of each case. *See Early & Daniel Co. v. Wedgefield, Inc.*, 164 F. Supp. 414 (M.D. N.C. 1958); *Stiffel Co. v. Sears, Roebuck & Co.*, 162 F. Supp. 637 (M.D. N.C. 1958). The district court has broad

discretion in determining whether to order a transfer. *See Paesch v. Winter*, 366 F.2d 756 (4th Cir. 1966).

Here, the parties do not dispute that the same parties in interest are involved in this case and in the Illinois Action. While the causes of action are not exactly the same, as the case at bar is a declaratory judgment action, while the Illinois Action is a direct patent infringement action, both actions clearly arise out of the same set of facts. The plaintiffs filed their Original Complaint in this case on February 17, 2011, while the defendants filed their Complaint in the Illinois Action on April 4, 2011. Thus, the court finds that the plaintiffs were the first to file. Pursuant to the first-to-file rule, when multiple suits are filed in different federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed. *See Allied-Gen. Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.1 (4th Cir. 1982) (citing *Carbide & Carbon Chems. Corp. v. U.S. Indus. Chems., Inc.*, 140 F.2d 47, 49 (4th Cir. 1944); *see also Hop-In Food Stores, Inc. v. S&D Coffee, Inc.*, 642 F. Supp. 1106, 1107 (W.D. Va. 1986). However, this rule is not to be mechanically applied. In *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594-95 (4th Cir. 2004) (quoting *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974)) (internal quotation marks and citations omitted) (emphasis added), the court stated that "the first suit should have priority, *absent the showing of balance of convenience in favor of the second action.*" Thus, the court must balance the convenience between the two actions before deciding whether application of the first-to-file rule is appropriate in a given situation.

-30-

For the court to grant a motion to transfer based on the convenience of the parties and witnesses, the balance of convenience must weigh strongly in favor of the moving party. *See Collins v. Straight, Inc.*, 748 F.2d 916, 921-22 (4th Cir. 1984). The party seeking a transfer cannot obtain it by bare balance of convenience in his or her favor, but must show a preponderant balance in his or her favor. *See Dev. Co. of Am. v. Ins. Co. of N. Am.*, 249 F. Supp. 117, 118-19 (D. Md. 1966). This court has stated that the burden is upon the movant "to disturb the plaintiff's choice of forum by showing that 'the balance of equities is in their favor [and] that judicial economy and convenience to all parties favor suit in another forum.'" *Glamorgan Coal Corp. v. Ratners Group, PLC*, 854 F. Supp. 436, 437-38 (W.D. Va. 1993) (quoting *Eldridge v. Bouchard*, 620 F. Supp. 678, 684 (W.D. Va. 1985)). Moreover, courts have held that a departure from the first-to-file rule might be warranted in situations involving bad faith, such as where the first suit was filed in an attempt to preempt an inevitable action or for the purposes of forum shopping. *See Neuralstem, Inc. v. StemCells, Inc.*, 573 F. Supp. 2d 888, 901 (D. Md. 2008); *Touchstone Research Lab, Ltd. v. Anchor Equip. Sales, Inc.*, 294 F. Supp. 2d 823, 826 (N.D. W. Va. 2003). Courts also have held that the plaintiff's choice of forum should be given weight, *see Norwood v. Kirkpatrick*, 349 U.S. 29 (1955), and should not lightly be set aside. *See Akers v. Norfolk & W. Ry. Co.*, 378 F.2d 78 (4th Cir. 1967). Unless the balance of convenience is strongly in favor of the defendant, the plaintiff's choice of forum should not, or should rarely, be disturbed. *See Sohns v. Dahl*, 392 F. Supp. 1208, 1217 (W.D. Va. 1975).

The defendants argue that Titan initially filed this action against Sisk when there was no justiciable case or controversy between Titan and Sisk with regard to the patent-in-suit. The defendants argue that Titan's filing of this lawsuit against

Case 1:11-cv-00012-JPJ-PMS   Document 78   Filed 08/22/11   Page 31 of 37   Pageid#: 1674

Sisk was nothing more than an attempt to preempt Sisk's and PMR's filing of an infringement suit. I find this argument unpersuasive because, as discussed above, there was a case or controversy between Titan and Sisk due to the February 1, 2011, indemnification agreement between Titan and Strata. The defendants further contend that the plaintiffs' subsequent filing of the Amended Complaint was an attempt to mirror the parties involved in the Illinois Action and otherwise cure defects in the Complaint. I find that this is nothing more than speculation on the defendants' part. However, even if the plaintiffs filed their Amended Complaint in response to the defendants' filing of its Complaint, I find this insufficient, in and of itself, to tip the balance of convenience in the defendants' favor. All of this being said, I am not persuaded by the defendants' argument that the plaintiffs engaged in forum shopping or improperly attempted to preempt a suit by the defendants.

Next, as found herein, this court has jurisdiction over both Sisk and PMR. However, there is a motion pending in the Southern District of Illinois, in which the plaintiffs in this case allege that the Illinois court lacks jurisdiction over Strata. It also does not appear that this motion is scheduled for hearing at this time.[4] This court already has found that it has jurisdiction over all parties, and this case has progressed further along than the Illinois Action. This weighs in favor of the plaintiffs' choice of forum. Additionally, although the Illinois court may very well be the most convenient forum for the defendants, the convenience of party witnesses carries little weight in the transfer analysis. Although there may be evidence and witnesses located in Illinois, this court views traveling to the plaintiffs' chosen forum when the balance of conveniences is not tipped in favor of the defendants simply to be a cost of doing business with out-of-state companies

---

[4] The court took judicial notice of the docket in the Illinois Action as of July 25, 2011. At that time, no hearing on this motion had been noticed. (Att. 1 to Docket Item No. 67).

-32-

like Strata. Furthermore, the court takes note of the fact that in modern litigation, documentary evidence is readily reproduced and transported from one district to another. *See Generac Corp. v. Omni Energy Sys., Inc.*, 19 F. Supp. 2d 917, 923 (E.D. Wis. 1998). While the location of relevant documentary evidence is an important consideration in determining whether to grant a transfer, it is insufficient to simply allege that a case should be transferred because corporate records are located at the defendants' home office in the proposed transferee district. Instead, the defendant must show that a large volume of records must be transported. *See Richards v. Upjohn Co.*, 406 F. Supp. 405 (E.D. Mich. 1976). Here, the defendants have not stated that the evidence that is located in Illinois would be so voluminous as to create a great burden on them to transport it to this forum or that it would be overly burdensome to do so for any other reason.

The defendants also allege that it will have witnesses not subject to this court's subpoena power. The availability of evidence and witnesses, and the expense of procuring their production or attendance, are important factors to be considered in determining whether a transfer is justified. An important factor is the availability of process to compel the attendance of an unwilling witness. *See DeLay & Daniels, Inc. v. Allen M. Campbell Co. Gen. Contractors, Inc.*, 71 F.R.D. 368, 372 (D. S.C. 1976). I find important that the defendants have not proffered to the court that any of these witnesses would be unwilling to testify voluntarily, thus requiring their presence by subpoena. That being said, I find that the convenience is not tipped in the defendants' favor based on this fact. Therefore, I find that this court's lack of subpoena power over some of the defendants' proposed witnesses is insufficient to justify transferring the case to the Southern District of Illinois for consolidation with the Illinois Action.

-33-

Another factor to be considered in the transferability analysis is whether the events upon which the action is founded occurred outside the forum. However, even if they did, this is not a sufficient reason in and of itself to justify a transfer. *See Oltman v. Currie*, 231 F. Supp. 654 (E.D. S.C. 1964). I find that the events out of which the action is founded occurred in both Virginia and Ohio, as well as other states. While the Agreement was executed in Illinois and, possibly, Ohio, the alleged breach of the Agreement and the alleged infringement was by Strata, a company that the defendants either knew or should have known, was a company with its sole warehouse in Virginia at that time and which sold products for use in mines located in Virginia and to out-of-state mines of Virginia operators. From August 2007 to sometime in 2008, Hamrick's office was in Virginia. Much of Strata's sales and purchasing efforts pursuant to the Agreement were conducted from Virginia. Even after Strata moved its primary office from Virginia to Ohio in 2008, Strata continued to operate the Virginia warehouse as a regional support center. On the other hand, any alleged infringement would result in damage to an Illinois-based company and its owner, an Illinois resident. However, any unfounded allegations of infringement against Strata would result in damage to a company with Virginia ties and potentially to Virginia mines or to non-Virginia mines with Virginia operators.

It is for all of these reasons that I find that the balance of the convenience does not preponderantly tip in the defendants' favor, and I recommend that the court deny the Motion insofar as it seeks to stay the case or transfer and consolidate it with the Illinois Action.

-34-

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  This court has subject matter jurisdiction as to Strata's claims against the defendants;

2.  This court has subject matter jurisdiction as to Titan's claims against the defendants;

3.  This court has general personal jurisdiction over PMR;

4.  This court has specific personal jurisdiction over Sisk;

5.  The Amended Complaint fails to adequately state a claim for a declaration that Titan did not directly or contributorily infringe or induce infringement of the '231 Patent;

6.  The Amended Complaint fails to adequately state a claim for inequitable conduct as to Sisk; and

7.  The court should not stay or transfer this case for consolidation with the Illinois Action because the defendants have failed to meet their burden of showing that the balance of convenience tips preponderantly in their favor.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion in part and deny the Motion in part.

-35-

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 22nd day of August, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-36-

37